IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| MICHAEL PIZZUTI, | : | |
|---|---|---|
| Petitioner | : | |
| v. | : | 3:14-CV-00956 |
| WARDEN JUAN BALTAZAR, | : | (JUDGE MARIANI) |
| Respondent | : | |

## MEMORANDUM

Michael Pizzuti, an inmate currently confined in the Allenwood Low Security Correctional Institution ("LSCI Allenwood") in White Deer, Pennsylvania, filed this pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241.  (Doc. 1).  Pizzuti claims that his due process rights were violated during the course of a prison disciplinary hearing where he was found to have committed the prohibited acts of giving money to another inmate without staff authorization and "Conduct which Disrupts the Security or Orderly Running of the Institution, most like Use of the Mail for Abuses Other than Criminal Activity." *Id.*  He further challenges the Bureau of Prisons' ("BOP") action in reducing his allowable good time credit for failure to remain satisfactorily enrolled in a general equivalency degree ("GED") program.  *Id.*  The petition is ripe for disposition and, for the reasons set forth below, will be denied.

## I.  **Background**

On August 4, 2006, while incarcerated the Federal Correctional Institution in

Gilmore, West Virginia ("FCI Gilmore"), Pizzuti agreed to enroll in FCI Gilmore's GED

classes. (Doc. 6, Ex. 1, p. 4).  Pizzuti remained enrolled in those classes until November 7,

2007, when he voluntarily withdrew from the program. *Id.* at 9.  As a result of Pizzuti

withdrawing from GED classes, his maximum possible good time credits earned per year

was reduced from fifty-four to forty-two. *Id.* at 7.  Pizzuti did not re-enroll in classes, but on

February 19, 2013, he passed an official GED examination. *Id.* at 9.  At that point, his

maximum possible good time credit per year was increased to fifty-four. *Id.* at 7.

On September 26, 2012, while incarcerated at LSCI Allenwood, Pizzuti was served

with Incident Report number 2356095 charging him with use of mail for abuses other than

criminal activity, a Code 296 violation, and giving money to another inmate without staff

authorization, a Code 328 violation.  (Doc. 6, Ex. 2, p. 19).  The reporting officer noted that:

> On September 26, 2012, at approximately 9:40 am, while monitoring email correspondence of inmate Michael Pizzuti, #51089-054, it was discovered he instructed a party on the outside to send money to another inmate without staff authorization.
>
> Specifically, on September 17, 2012, at 9:45 pm, Inmate Pizzuti wrote an outgoing email to Puntillo65@aol.com. Within the email correspondence, inmate Pizzuti instructed the other party, "Also don't forget to pay the [sic] PETER the painter the $60 you own [sic] him." A review was conducted of incoming money received by Inmate "Peter" Porcelli, #077340-025, who is known to prepare legal work for inmates for money. On September 23, 2012, inmate Porcelli received $60 via lockbox. There was no name identifying the sender. The address was 110 Waverly St, Yonkers NY. A review was conducted of inmate Porcelli's financial accounts, as well as his

2

communication accounts. Inmate Porcelli does not receive any funds from anyone in NY. Inmate Porcelli receives his funds from Olsmar, FL. In addition, the only contact inmate Porcelli maintains in NY is his sibling, Cynthia Nocero, 3 Graystone Lane, Smithtown NY, 11787.

It is known that inmate Pizzuti has ongoing legal actions. Inmate Pizzuti has no communication and/or financial contacts at a Yonkers, NY, address. Thru [sic] preponderance of evidence, it is determined that on September 17, 2012, inmate Pizzuti instructed an outside party to send $60 to inmate Peter Porcelli. On September 23, 2012, inmate Peter Porcelli received $60 from an address that he has no communication and/or financial ties with.

*Id.*

On October 3, 2012, Pizzuti appeared before the Unit Disciplinary Committee

("UDC") and denied the charges, stating "I'm going [to] fight this." *Id.* at 21. The UDC

referred the charges to the Discipline Hearing Officer ("DHO"). *Id.* Upon conclusion of the

UDC hearing, a staff member provided Pizzuti with a copy of the "Inmate Rights at

Discipline Hearing" form and a "Notice of Discipline Hearing Before the DHO" form. *Id.* at

23-25. Pizzuti signed the forms and requested Mr. Hotchkiss as his staff representative. *Id.*

Pizzuti indicated that he wished to call two witnesses on his behalf: his spouse, Michelle

Pizzuti, and Peter Porcelli. *Id.*

On October 18, 2012, Pizzuti and his staff representative appeared for a hearing

before the DHO. *Id.* at 27. Staff Representative Hotchkiss stated that he had met with

Pizzuti to discuss the case. *Id.* Pizzuti was informed of his rights before the DHO, and

indicated that he understood those rights. *Id.* Thereafter, Pizzuti stated:

> She's making a big leap trying to tie me to Porcelli. I have major construction going on in my house. I'm on the phone all the time trying to

3

> work on my construction. I have no connection to that Waverly address. I
> wonder how many other inmates got $60?

*Id.* Only one procedural issue was cited and no documentary evidence was provided to the
DHO for consideration. *Id.* at 28.

Inmate Peter Porcelli was then called to provide testimony. *Id.* Porcelli informed the
DHO that he was not aware of Pizzuti having sent any funds to him. *Id.* He further stated
that he did not know who had sent him the sixty dollars and, while he had family in New
York State, his wife Nicole and children lived in Florida. *Id.* Porcelli also testified that "he
had no known family who resided at 110 Waverly Street, Yonkers, NY." *Id.* Pizzuti's wife,
Michelle Pizzuti, "was not present for testimony, nor did she provide a written statement." *Id.*

In addition to the aforementioned testimony, the DHO also relied upon the incident
report, an October 2, 2012 memorandum from J.M. Cramer, a copy of the e-mail sent from
Pizzuti to his wife Michelle Pizzuti, a copy of the postal money order addressed to Peter
Porcelli, a photocopy of the visitor information form completed by Michelle Pizzuti, and a
"Truview Inmate Center Report" for Peter Porcelli. *Id.*

The DHO noted that Inmate Porcelli had never received funds from anyone in New
York, and had only had contact with one individual in New York, his sister who lived at 2
Graystone Lane, Smithtown, NY. *Id.* at 29. The DHO reviewed a photocopy of the money
order that had been placed into Porcelli's account as well as the envelope it was mailed in.
*Id.* After comparing the handwriting on the money order and envelope to the handwriting
contained in Michelle Pizzuti's visitor information form, the DHO noted that the writing was

4

"quite similar" and therefore concluded that Michelle Pizzuti was the individual who wrote

the sixty dollar money order to Porcelli. *Id.* The DHO further concluded that the

> e-mail requesting Peter receiving $60 was . . . the request from Pizzuti to
> have monetary funds sent to Porcelli. Referencing the e-mailed party owing
> "Peter the painter," was believed to have been a ruse to hide the true receiver
> of the monetary funds. All considered . . . Pizzuti [was] complicit in having
> monetary funds sent to Porcelli.

*Id.*

The DHO amended the Code 296 infraction to a Code 299 infraction, "Conduct

Disruptive to the Orderly Running of the Facility, most like, Misuse of the Mail." *Id.* The

DHO then concluded that "the greater weight of the evidence . . . supports the finding [that]

PIZZUTI . . . committed the prohibited acts of Conduct Which Disrupts the Security or the

Orderly Running of the Institution, most like, Use of the mail for abuses other than criminal

activity and Giving money to another inmate without staff authorization[.]" *Id.*

The DHO sanctioned Pizzuti with the disallowance of twenty-six days good conduct

time and the loss of e-mail privileges for six months for the violation of Code 299. *Id.* at 30.

Pizzuti was sanctioned with the disallowance of ten days good conduct time and the loss of

four month commissary privileges for the violation of Code 328. *Id.* The DHO reasoned

that Pizzuti's violation of Code 299 threatened the orderly running of the institution, because

the payment of funds to another prisoner "is typically preceded by some sort of debt . . .

[which] often fosters violence in relation to payment/non-payment." *Id.* Consequently, good

conduct time was disallowed "in an effort to punish" Pizzuti for his conduct, and the loss was

5

privileges were imposed to "deter him from [such] activity in the future." *Id.* At the

conclusion of the hearing, Pizzuti was advised of his right to appeal.[1] *Id.*

## II. **Discussion**

28 U.S.C. § 2241 provides, in relevant part, that a writ of habeas corpus may not

extend to a prisoner unless he or she "is in custody in violation of the Constitution or laws . .

. of the United States." Liberty interests protected by the Fifth Amendment may arise either

from the Due Process Clause itself or from statutory law. *Torres v. Fauver*, 292 F.3d 141,

150 (3d Cir. 2002) (citing *Asquith v. Dep't of Corr.*, 186 F.3d 407, 409 (3d Cir. 1999)).

Protected liberty interests exist in prison disciplinary proceedings where an inmate loses

good conduct time. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). However, "prison

disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights

due a defendant in such proceedings does not apply." *Id.*

### A.     **Reduction of Good Time Credits**

The Prison Litigation Reform Act ("PLRA") established a mandatory functional

literacy program "for all mentally capable inmates who are not functionally literate." 18

U.S.C. § 3624(f)(1). The PLRA further required the BOP to offer incentives for inmates to

complete such programs. *Id.* at § 3624(f)(2). In implementing these mandates, the BOP

has created dual program system; one mandatory program, and one optional program. An

inmate without a high school diploma or GED must participate in the literacy program for

---

[1] It is undisputed that Pizzuti appealed the DHO's decision and properly exhausted all administrative remedies. *See*, doc. 6, n. 1.

240 educational hours, or until he or she receives a GED, whichever comes first. 28 C.F.R. § 544.70. Failure to do so may result in disciplinary action. *Id.* at § 544.75.

Thereafter, participation in the literacy program is not required, but participation will affect the prisoner's possible good conduct time. *See*, 28 C.F.R. § 523.20. Inmates may earn up to fifty-four days of good conduct time credit each year if they have earned are "making satisfactory progress toward earning a GED credential or high school diploma." *Id.* If the inmate has not earned a GED and is not making satisfactory progress toward earning a GED or high school diploma, he or she may earn a maximum of forty-two days of good conduct time credit per year. *Id.* Regulations provide that an inmate "shall be deemed to be making satisfactory progress" unless, in relevant part, he or she withdraws from the literacy program. *Id.* at § 544.73(b)(1).

Here, it is undisputed that Pizzuti voluntarily withdrew from the literacy program after completing 240 educational hours, but prior to receiving a GED. (Docs. 1, 6, 7). Consequently, the BOP could not sanction Pizzuti for non-participation in the literacy program, but was required to reduce the available good conduct credit time available each year to forty-two days. *See*, 28 C.F.R. §§ 523.20, 544.75. *See also*, *Livengood v. Bureau of Prisons*, 503 F.App'x 104, 106-07 (3d Cir. 2012). While Pizzuti does not dispute this basic fact, he argues that he was never informed of the consequences of withdrawing from the literacy program. (Docs. 1, 7). This argument is ultimately unconvincing.

In the response to Pizzuti's habeas petition, Respondent provided a sworn affidavit from J. Reibsome, Case Management Coordinator at the Lewisburg United States Penitentiary. (Doc. 6, Ex. 1). Attached to Reibsome's affidavit is a true an accurate copy of several printouts from the BOP's SENTRY computer system, a system used to electronically maintain BOP data. *Id.* A printout of Pizzuti's "Inmate Education Data Program Review" confirms that Pizzuti voluntarily requested to withdraw from the literacy program on November 7, 2007. *Id.* at 9. That printout includes a notation stating that Pizzuti was counseled on the consequences of withdrawing, specifically as they related to good conduct time credits, by his teacher, case worker, and supervisor of education. *Id.* The notation indicates that Pizzuti signed a form confirming his understanding of the consequences of his withdrawl. *Id.*

In addition to this document, the FCI Gilmore Inmate Admission and Orientation Handbook ("Handbook") supports the conclusion that Pizzuti understood the consequences of withdrawing from the literacy program. The Handbook sets forth the basic rules and procedures at FCI Gilmore to "help new inmates understand what they will be encountering when they enter prison, and assist them in their initial adjustment to incarceration." Significantly, page forty-six of the Handbook notes that:

> For inmates sentenced under the PLRA . . . the [good conduct time] earned for time spent in service of the sentence does not vest. In addition, if an inmate does not have a high school diploma or a GED, and the inmate is not making satisfactory progress toward earning a GED, only 42 days of [good conduct time] will be earned for each year in the service of the sentence.

This language unambiguously notifies all inmates of the consequences that result from the failure to make satisfactory progress towards earning a GED. Pizzuti argues that the Respondent has not produced a copy of the actual form signed by Pizzuti indicating that he was in fact counseled regarding the consequences of his withdrawal. (Doc. 7). However, any such documentary evidence likely was disposed of by the BOP in the roughly five year time frame between Pizzuti withdrawing from the program and his administrative appeal. In any event, the SENTRY form provided by the Respondent, along with the language in the Handbook, sufficiently demonstrates that Pizzuti understood that removing himself from the literacy program would result in a reduction in the possible good time credits earned each year. Consequently, Pizzuti's due process rights were not violated by this action.[2]

## B.    Disciplinary Hearing

Pizzuti issues four challenges to the DHO's determination regarding incident report number 2356095. (Docs. 2, 7). First, Pizzuti argues that he was not provided twenty-four hours' notice of the charges against him because the DHO amended the charges at the hearing. *Id.* Second, he argues that his staff representative provided ineffective assistance. *Id.* Third, Pizzuti contends that he was denied access to certain evidence prior

---

[2] It is not clear that Pizzuti had any protected liberty interest in the opportunity to earn good time credits, and therefore even if BOP regulations had been violated, such violation may not have triggered any due process concerns. *See, Luken v. Scott,* 71 F.3d 192, 193 (5th Cir. 1995) (holding that "the mere opportunity to earn good-time credits" does not constitute a protected liberty interest). *See also, Colon v. Zickefoose,* Civ. No. 12-3433, 2013 WL 6497957, at *6 (D.N.J. Dec. 11, 2013) (collecting cases). Because Pizzuti's claim fails on the merits, it is not necessary to determine whether a protected liberty interest did exist.

9

to the DHO hearing. *Id*. Finally, he argues that the DHO's decision was against the weight of the evidence. *Id*.

## 1. Procedural Rights

Where an inmate is subjected to a disciplinary hearing in which he or she loses good time credit, the following minimum procedural due process rights must be afforded to a prisoner: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the disciplinary charges; (3) an opportunity to call witnesses and present documentary evidence in his or her defense when it is consistent with institutional safety and correctional goals; (4) assistance from an inmate representative if the charged inmate is illiterate or complex issues are involved; and (5) a written decision by the fact finder of the evidence relied upon and the rationale behind the disciplinary action. *Wolff*, 418 U.S. at 563-70.

### a. *Twenty-Four Hour Notice*

Pizzuti was provided at least twenty-four hours' notice of the charges against him. Pizzuti was provided a copy of the incident report on September 26, 2012, and did not appear before the DHO until October 18, 2012, twenty-two days later. (Doc. 6, Ex. 2, pp. 19, 27). However, Pizzuti maintains that, because the DHO amended one of the charges from Code 296, use of mail for abuses other than criminal activity, to a Code 299 violation "Conduct Which Disrupts the Security or the Orderly Running of the Institution, most like,

10

Use of the mail for abuses other than criminal activity[,]" he was not provided sufficient notice of that charge. (Docs. 2, 7).

While a prisoner is entitled to twenty-four hour notice of charges against him or her, the failure to provide notice of a specific charge is of "no consequence" if the DHO ultimately concludes that the prisoner committed a different but similar prohibited act. *Guerrero v. Recktenwald*, 542 F.App'x 161, 164 (3d Cir. 2013) (quoting 28 C.F.R. §541.8(a)(1)). *See also*, *Northern v. Hanks*, 326 F.3d 909, 910 (7th Cir. 2003) (holding that a prisoner's due process rights are not violated when the DHO alters the charges so long as advanced notice is given of the facts supporting the new charge).

Here, the charges and the facts provided in the incident report placed Pizzuti on sufficient notice that he could be found to have violated Code 299. The factual basis for the alleged violation of Code 296 was the use of e-mail to instruct his wife to pay sixty dollars to a fellow inmate in violation of BOP rules. This was sufficient to apprise Pizzuti of the fact that he could be subject to a charge of engaging in conduct, specifically the abuse of mail, which disrupts or interferes with the security or orderly running of the institution.

Furthermore, the facts and charges were sufficient to allow Pizzuti "to marshal the facts and prepare a defense[,]" the sole purpose of providing twenty-four hours' notice of the charges. *Wolff*, 418 U.S. at 564. In this instance, an essential element of the Code 299 charge was the act of abusing e-mail privileges. In that vein, the DHO concluded that Pizzuti's abuse of mail worked to disrupt or interfere with the security or orderly running of

11

the institution. Thus, the DHO could not have found that Pizzuti violated Code 299 without first finding that he violated Code 296. Had Pizzuti successfully defended against the alleged violation of Code 296, he likewise would have successfully defended against an alleged violation of Code 299. As a result, Pizzuti's defense would likely have been identical had he been known of the Code 299 charge, and he fails to explain how his defense could possibly have been any different. Accordingly, Pizzuti's due process rights were not violated by the conclusion that he had violated Code 299, rather than Code 296.

### b. *Staff Representation*

Next, Pizzuti argues that he was provided inadequate representation by his staff representative. (Docs. 2, 7). Specifically, Pizzuti contends that his staff representative failed to access the e-mail system to obtain evidence which would have shown "that the sent email was never accessed by its recipient[.]" *Id*. In prison disciplinary hearings, a prisoner only has a constitutional right to a staff representative if he or she is illiterate or if complex issues are involved such that he or she likely could not "collect and present the evidence necessary for an adequate comprehension of the case[.]" *Wolff*, 418 U.S. at 570. However, the BOP has administratively expanded this right, and provides that inmates "are entitled to have a staff representative during the DHO hearing process[.]" 28 C.F.R. §541.8(d). Prior to the DHO hearing, a staff representative "will be available to help [the prisoner] understand the incident charges and potential consequences." 28 C.F.R. §541.8(d)(2).

12

Here, there is no allegation or evidence that Pizzuti is illiterate, and the issues involved are not so complex that he was unable to marshal evidence or adequately understand the case. Consequently, Pizzuti was not entitled to a staff representative as a matter of constitutional right.

To the extent that Pizzuti was entitled to a staff representative under BOP regulations, the evidence does not suggest that any due process violation occurred as a result of the representative's purported ineffectiveness. Hotchkiss, the staff representative that Pizzuti had specifically requested, did appear at the DHO hearing and informed the DHO that he had met with Pizzuti prior to the hearing to discuss the case. (Doc. 6, Ex. 2, p. 27). At the beginning of the hearing, Pizzuti was advised of his rights before the DHO, and "indicated that he understood" those rights. *Id.* Pizzuti did not raise any issues relating to the effectiveness of his representative, nor did he argue that Hotchkiss had failed to pursue relevant evidence. *Id.* Thus, there is no evidence that Pizzuti was effectively denied a right to staff representation.

Furthermore, Pizzuti has failed to show that any purported inadequacy on the part of his staff representative prejudiced him in any way. While Pizzuti alleges that the BOP's e-mail system would have shown that the e-mail he sent to his wife "was never accessed by its recipient," he has offered no proof confirming this statement, nor has he offered proof that Hotchkiss did not access the e-mail system to confirm that the e-mail was or was not opened. Notably, Pizzuti had failed to provide any evidence demonstrating that the

recipient never opened the e-mail, and he has not produced an affidavit from his wife
confirming that she never opened the e-mail. Absent any proof whatsoever that Hotchkiss
failed in his duties as a staff representative, or that any exculpatory evidence existed, it
cannot be said that Pizzuti was harmed in any way by the error he alleges and therefore, his
due process rights were not violated. *See, Millhouse v. Bledsoe*, 458 F.App'x 200, 203 (3d
Cir. 2012) (A prisoner "cannot show that his right to due process was violated by a technical
non-compliance with a regulation where [non-compliance] did not prejudice him") (citing
*Wilson v. Ashcroft*, 350 F.3d 377, 380-81 (3d Cir. 2003)).

### c. *Failure to Provide Certain Evidence*

Finally, Pizzuti argues that his due process rights were violated when he was not
provided with inculpatory evidence, specifically the exemplar of his wife's handwriting, prior
to the DHO hearing. Pizzuti has not pointed to any relevant case law, statute, or regulation
that would grant such a right.

While prisoners do have the right to present evidence to the DHO, *Wolff*, 418 U.S. at
566, the Supreme Court has never recognized a broader right to receive all discovery
materials prior to a prison disciplinary hearing. As previously noted, "prison disciplinary
proceedings are not part of a criminal prosecution and the full panoply of rights due a
defendant in such proceedings does not apply." *Id*. Importantly, the Supreme Court in
*Wolff* declined to "impose the requirement that prison officials disclose to the [prisoner] all of
the evidence against him." *Sivak v. Cluney*, 977 F.2d 591, 591 (9th Cir. 1992) (citing *Wolff*,

14

418 U.S. at 571). Consequently, Pizzuti did not have a constitutional right to access all evidence against him prior to the DHO hearing.

### 2. Sufficiency of the Evidence

In his petition, Pizzuti primarily challenges the sufficiency of the evidence relied upon by the DHO to conclude that he had committed the prohibited acts. (Docs. 2, 7). Where a petitioner challenges the sufficiency of the evidence used in a prison disciplinary hearing, the district court must affirm the finding if there is "some evidence in the record" that supports the finding. *Superintendent v. Hill*, 472 U.S. 445, 455-57 (1985). The standard is not an exacting one, and the district court is limited to determining if there is "any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* In so doing, the court need not examine "the entire record, [conduct an] independent assessment of the credibility of witnesses, or weigh[] . . . the evidence." *Id.*

Here, the DHO decision was based on at least some evidence. The DHO reviewed Pizzuti's e-mail to his wife, directing her to pay sixty dollars to "PETER the painter." (Doc. 6, Ex. 2, p. 28-29). The DHO observed that, just six days after this e-mail was sent, inmate Peter Porcelli received a postal money order for sixty dollars. *Id.* The DHO noted that the money order had been sent from Yonkers, New York. *Id.* The evidence established that Porcelli had no family or friends in this area, did not communicate with anyone in this area, and had never before received money from anyone in this area. *Id.* The DHO did note that

15

Porcelli claimed he did not know who had sent him the sixty dollars, and claimed that he was unaware of Pizzuti sending him any money. *Id.*

The DHO compared the handwriting on a visitor information form completed by Pizzuti's wife with the handwriting on the postal money order and accompanying envelope. *Id.* The DHO believed that the handwriting on the two documents were "quite similar" and concluded that "Michelle Pizzuti . . . [was] the party who completed the money order sent to [Peter] Porcelli." *Id.* at 29. The DHO therefore found that the greater weight of evidence supported a finding that Pizzuti had violated Codes 299 and 328. *Id.*

Pizzuti correctly points out that there is no direct evidence linking Pizzuti to the money transfer made to Porcelli. However, no statutory or judicial authority requires that a DHO only rely upon direct evidence of a violation in a prison disciplinary hearing. DHOs are entitled to rely upon circumstantial evidence in reaching a conclusion, so long as that circumstantial evidence is sufficient to satisfy the "some evidence" standard. DHOs are not deprived of their power of deductive and logical reasoning, and may make inferential determinations based upon the available evidence, as could any other factfinder. Here, the DHO used deductive reasoning and reached a sound, logical conclusion based on all of the evidence available at the hearing. While the evidence presented was by no means overwhelming, the DHO did base the decision upon some evidence, and therefore this Court must affirm that decision.

16

### 3. Sanctions Imposed

Finally, all sanctions imposed by the DHO were within the limits of 28 C.F.R. §541.3(b). Pizzuti was found to have committed two offenses, one 300 level, moderate severity prohibited act, and one 200 level, high severity prohibited act. (Doc. 6, Ex. 2, p. 30). Pursuant to DHO regulations, for a 300 level offense a prisoner may be sanctioned with, *inter alia*, disallowance of good conduct time available for the year, ordinarily 25% (1-14 days) and loss of privileges. 28 C.F.R. §541.3(b). For a 200 level offense, a prisoner may be sanctioned with, *inter alia*, disallowance of good conduct time available for the year, ordinarily between 25% and 50% (14-27 days) and loss of privileges. *Id*.

Here, the DHO sanctioned Pizzuti with the disallowance of ten days good conduct time and loss of commissary privileges for four months based on the violation of Code 328. (Doc. 6, Ex. 2, p. 30). For the violation of Code 299, Pizzuti was sanctioned with the disallowance of twenty-six days good conduct time and loss of e-mail privileges for six months. *Id*. Consequently, the sanctions imposed by the DHO in the present case were consistent with the severity level of the prohibited act, and were within the maximum available. *See*, 28 C.F.R. §541.3(b).

### III. **Conclusion**

A review of the record reveals that the Pizzuti's due process rights were not violated, the decision of the DHO is supported by some evidence, and the sanctions imposed were

within the statutory maximum.  Consequently, Pizzuti's petition for writ of habeas corpus will be denied.

An appropriate Order will be entered.

BY THE COURT:

Robert D. Mariani
United States District Judge

Dated: January  /5    , 2015